UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CASETECH SPECIALTIES, INC., ET AL.,

Plaintiffs,

v.

SELECTIVE INSURANCE CO.,

Defendant.
_________________________________/

Case No. 13-11792

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [10]**

This insurance dispute is before the Court on Plaintiffs' motion for partial summary judgment asking the Court to interpret provisions of its commercial property insurance policy with Defendant Selective Insurance Company of the Southeast ("Defendant Insurer") and declare that the policy's optional coverage language, "Replacement Cost (without deduction for depreciation)," means replacement of damaged equipment with new equipment. Defendant Insurer disagrees with this interpretation, arguing instead that this language only requires it to reimburse Plaintiff Insured for the cost of replacing its old,

damaged equipment with used equipment of comparable material and quality.[1] For the reasons stated below, Plaintiffs' motion is GRANTED.

## I. Facts

Plaintiff Casetech Specialties, Inc. ("Casetech" or "Plaintiff Insured") is owned and operated by Plaintiff Anthony Armeni. Casetech is a small business that manufactures and installs custom cabinetry. (Compl., ¶¶ 5, 6, 14, and 15.)

On June 7, 2012, an electrical surge at the building leased by Casetech destroyed several large pieces of industrial equipment used in the fabrication of custom cabinetry, including an 8,500 lb Biesse Rover 18 CNC Machining Center (the "Router"), an 8,500 lb Holzer CA80 Panel Saw (the "Panel Saw"), and the table sensor on a Gannamat SRT Express. (Compl., ¶ 20.) Casetech's owner, Mr. Armeni, notified his insurance agent, and she referred him to Julie Ross, the local representative for Defendant Insurer. (Def.'s Resp., Ex. 1, Armeni Dep. at 50.) Julie Ross told Mr. Armeni that she would send out an adjuster, Dennis Dobransky, and also suggested that Mr. Armeni call the Router manufacturer, Biesse, and get estimates for a comparable Router. She also suggested that he do the same for the Panel Saw. Plaintiff Armani did as suggested. (*Id*.)

---

[1]At the hearing, held on December 19, 2013, the parties clarified that Plaintiffs' motion addresses only this one policy-interpretation issue. Thus, as Defendant conceded, there is no need for the Court to address its additional arguments that (1) Plaintiff Insured is not entitled to any reimbursement for "Replacement Cost" of the damaged equipment until the damaged property is actually replaced, and unless the replacement is made as soon as reasonably possible after the damage; (2) because Plaintiff Insured has not satisfied this condition precedent of the insurance policy, Defendant Insurer is not obligated to make any reimbursement under the "Replacement Cost" Optional Coverage provision; and (3) even if Defendant Insurer is required under the policy to pay for new equipment to replace the old damaged equipment, the Coinsurance Penalty Provisions in the policy substantially reduce the amount, if any, owed Plaintiff Insured.

On June 20, 2012, Plaintiffs learned that the models of the damaged Router and Panel Saw were discontinued. Plaintiff Armeni testified that he was told to get quotes for new replacements that were comparable to the damaged Router and Panel Saw, and he did so. (*Id.* at 50-52.) The Router manufacturer, Biesse, informed Plaintiff Armeni that "[t]he closest replacement model" for the destroyed Router "would be a Rover AS 1332," an "entry level machine capable of 'pendulum processing' meaning, the machine has multiple zones like your current [Router]. . . ." (Pls.' Mot., Ex. C, 6/20/12 ltr.) Its price was $109,700, and included installation, training, and a one-year factory warranty. (*Id*.) Another replacement Router similar to the Biesse Router was identified as the Weeke CNC Machining Center, Model Venture 106E; and its price was $124,900, including delivery and installation. (Compl., ¶ 22.) The most comparable Panel Saw was a Holzma Optimat HPP 250R, which was available for $77,500. (*Id*.)

The anticipated replacement cost for new Router and Panel Saw was $185,200; less than Plaintiffs' policy limit of $364,000. (Pls.' Mot., Ex. B, Coverage Schedule.)

Defendant Insurer had an adjuster, Dennis Dobransky, come out to Casetech to examine the damaged equipment. Mr. Dobranksy called in another professional, Pat Campion, who thought the equipment might be repairable. (*Id*. at 52.) Mr. Campion told Plaintiff Armeni that the best they could do at that point was to try and get Casetech's business up and running as quickly as possible and suggested that Plaintiff get some used equipment in the meantime. That is what Plaintiff Armeni did, finding a used Morbidelli Router that was immediately available. (*Id*. at 52-55.) Before he could make arrangements to purchase that used Router or locate a used Panel Saw, however, Mr. Dobransky notified

Plaintiff Insured that its claim might not be covered and that actual physical damage to the Router and Panel Saw would have to be verified to obtain coverage under its policy.

After getting nowhere on that issue with either Mr. Campion or Mr. Dobransky, Plaintiff Armeni hired an adjuster, Howard Mishne, who had coverage discussions with Mr. Dobransky. Although Mr. Mishne told Plaintiff that Casetech's policy had Replacement Cost Coverage that entitled it to new equipment to replace the old, damaged equipment, Plaintiff Armeni continued to look for a used Router and Panel Saw because it took weeks for new equipment to arrive and be set up and he wanted to get the business up and running as soon as possible. (*Id*. at 54-60.)

In his affidavit, Mr. Dobransky avers the following. After being informed by Plaintiffs of the damaged equipment, Defendant Insurer notified HSB, its equipment reinsurer. Mr. Dobransky was the HSB claims adjuster assigned to Plaintiff Insured's claim. (Def.'s Resp., Ex. 4, Dobransky Aff., ¶¶ 1-2.) Mr. Dobransky told Plaintiff Armeni that direct physical damage to the Panel Saw and Router was required to trigger coverage under Casetech's insurance policy. To verify direct physical damage, HSB hired an equipment consultant to inspect the Router and Panel Saw. (*Id*. at ¶¶ 3-4.)

On July 11, 2012, while Defendant Insurer was evaluating whether there was "direct physical damage" to the Router and Panel Saw, Plaintiff Armeni advised Defendant that he had located a used Morbidelli CNC Machining Center, point-to-point router, for $32,500 that could be installed for $3,975 and a used panel saw for $35,000; for a total of $71,475. (Def.'s Resp., Ex. 5, faxed 6/26/12 invoice and faxed 7/10/12 proposal; Ex. 6, faxed page from website; Ex. 4, Dobransky Aff., ¶ 5.)

On July 19, 2012, Plaintiff Insured hired Globe Midwest/Adjusters International, Professional Loss Consultants, to represent it in its insurance claim for the June 7, 2012 loss, and notified Defendant Insurer of that fact. Globe Midwest assigned Howard Mishne to handle Plaintiff Insured's insurance claim. (Def.'s Resp., Ex. 4, Dobransky Aff., ¶ 6.)

On July 20, 2012, Defendant Insurer verified direct physical damage to Plaintiff Insured's Router. (*Id*. at ¶ 7.)

On August 1, 2012, Defendant Insurer verified direct physical damage to Plaintiff Insured's Panel Saw. (*Id.* at ¶ 7.)

On August 1, 2012, Howard Mishne emailed Dennis Dobransky with quotes for replacements of the Router ($50,756.96) and Panel Saw ($47,600.00) with used equipment, and requested that Dobransky contact him to discuss settlement of this portion of Plaintiff Insured's claim. (*Id*. at ¶ 8; Def.'s Resp., Ex. 8, 8/01/12 email.)

Subsequently, Plaintiff Insured requested authorization to purchase the used Router and Panel Saw, but Defendant Insured raised the issue of a Coinsurance Penalty Provision being potentially applicable to Plaintiff Insured's loss. Plaintiff Insured's agent, Mr. Mishne, responded that if used equipment is purchased, then the Coinsurance Penalty must be calculated using used equipment valuations thus avoiding any Coinsurance Penalty. Defendant Insurer and HSB agreed to pay Plaintiff Insured in advance so it could purchase the used equipment. A $90,000 payment was issued toward the purchase of the used Router and Panel Saw, but "<u>[t]he full replacement cost</u> was not paid because replacement cost <u>is not payable</u> under the policy unless and <u>until the equipment is actually replaced</u>." (Def.'s Resp., Ex. 4, Dobransky Aff., ¶¶ 9-10 (emphasis added).)

Dobransky avers that Defendant Insurer had "accepted liability for the cost to replace both machines with used machines of like kind and quality" and received quotes from Mr. Mishne for replacements for about $101,000 installed. (Pls.' Mot., Ex. F, 9/11/12 email from Dobransky to Mishne (emphasis added).)

On August 7, 2012, HSB authorized Defendant Insurer "to issue a partial payment for the machines for $90,000." (*Id*.)

On August 14, 2012, Defendant Insurer emailed HSB notifying it that "the check was being mailed from New Jersey." (*Id*.)

On August 14, 2012, Mr. Mishne emailed Mr. Dobransky notifying him that:

. Plaintiff Insured disagreed with Defendant Insurer's policy interpretation construing "Replacement Cost" as meaning only used replacement equipment;

. Plaintiff Insured's position was that "Replacement Cost" means new for old damaged equipment;

. Plaintiff Insured was requesting a formal written clarification from Defendant Insurer confirming its interpretation this policy language;

. Plaintiff Insured's intent was to obtain new equipment to replace the old, damaged equipment;

. Plaintiff Insured sought used equipment as a temporary fix because that was all Defendant Insurer said it would cover under the policy as a replacement and this would permit it to re-open for business until it obtained new replacement equipment;

. Due to Defendant Insurer's coverage questions and delays caused solely by the incompetency of Defendant Insurer's agent, Plaintiff Insured lost opportunities to purchase any available equipment; and when Defendant Insurer finally agreed to pay something under the policy, there were no comparable pieces of equipment available even in the used marketplace; and

. Plaintiff Insured requested "immediate payment of the replacement cost for new machines" and expressed its willingness to "provide the names

> of vendors who [could] be named on the checks to accommodate the replacement option of the policy."

(Pls.' Reply, Ex. E, 8/14/12 email.)

After Plaintiff Insured's receipt of Defendant Insurer's $90,000 check, it purchased the previously-quoted used Panel Saw for about $50,000.00 and rented a replacement Router for $2,333.33 a month.[2] (Def.'s Resp., Ex. 4, Dobransky Aff., ¶¶ 11-14.)

Plaintiff Armeni testified that the $90,000 check was only a partial payment of what was owed to Plaintiff Insured under its policy. He further testified that it allowed Plaintiff Insured to do something temporarily to mitigate its losses (it had received a letter from Defendant Insurer informing it of the obligation to do so) by obtaining a used Panel Saw and rental Router. (Pls.' Reply, Ex. D, Armeni Dep. at 60-62, 64.)

Plaintiff Insured subsequently learned that the electrical surges that damaged the Router and Panel Saw were caused by a defect in it's leased business premises, and in October 2012, relocated from Troy to Fraser, Michigan. (*Id*. at 64; Compl., ¶¶ 5, 7, 50.)

In November and December 2012, Plaintiff Insured's agent, Mr. Mishne, reiterated its demand for new replacement equipment and continued to challenge Defendant Insurer's interpretation of its policy's "Replacement Cost" Optional Coverage provisions. (Compl., ¶¶ 51-52, 55.)

On March 25, 2013, Plaintiffs filed suit against Defendant Insurer in state court alleging claims of breach of contract, violation of Michigan's Uniform Trade Practices Act, breach of fiduciary duty, theft/conversion/embezzlement, and for a declaratory judgment.

---

[2]The rental Router was subsequently damaged by an electrical surge, generating a second insurance claim.

(Compl.) Defendant subsequently removed the action here on grounds of diversity jurisdiction.

## II. Summary Judgment Standard

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. Analysis

Plaintiffs' motion requires the Court to interpret provisions of Casetech's commercial property insurance policy. Those provisions are set forth below. The Court begins,

however, with the general principles it must follow when construing contract provisions under Michigan law.[3]

**A. General Principles of Contract Interpretation**

The rules of construction for insurance contracts are the same as those for any other written contract. *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993). First, the court must determine whether the contract language at issue is ambiguous or unambiguous. Second, the court must construe the contract. The question of whether a contract is ambiguous is a question of law for the court. *Steinmetz Elec. Contractors v. Local Union No. 58*, 517 F. Supp. 428, 432 (E.D. Mich. 1981); *Mayer v. Auto-Owners Ins. Co.*, 338 N.W.2d 407, 409 (Mich. Ct. App. 1983). Construction of the insurance contract is also a question of law for the court. *Petovello v. Murray*, 362 N.W.2d 857, 858 (Mich. Ct. App. 1984); *Fragner v. Am. Cmty. Mut. Ins. Co.*, 502 N.W.2d 350, 352 (Mich. Ct. App. 1993). The function of the court is to determine and give effect to the parties' intent as discerned from the policy's language, looking at the policy as a whole. *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 434 (Mich. 1992). Policy in an insurance contract is given its ordinary meaning "unless it is apparent from a reading of the whole instrument that a different or special meaning was intended." *Comerica Bank*, 3 F.3d at 942. It is improper for the court to ignore the plain meaning of the policy's language in favor of a technical or strained construction. *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F. Supp. 59, 66 (W.D. Mich. 1989).

**B. Policy Language**

---

[3]The parties do not dispute that Michigan law applies to their contract dispute.

It is not disputed that Plaintiff Insured suffered a covered loss. Likewise, it is undisputed that, although the basic grant of coverage under its policy is for the Actual Cash Value of the covered property, Plaintiff Insured purchased Optional Replacement Cost Coverage. Relevant portions of the Replacement Cost Coverage provisions are as follows:

> G. Optional Coverages
>
> * * * * *
>
> 3. Replacement Cost
>
> a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.
>
> * * * * *
>
> c. You may make a claim for loss or damage covered by this insurance on an actual cost basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.
>
> d. We will not pay on a replacement cost basis for any loss or damage:
>
> (1) Until the lost or damaged property is actually repaired or replaced; and
>
> (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.
>
> * * * * *
>
> e. We will not pay more for loss or damage on a replacement cost basis than <u>the least of</u> (1), (2) or (3) . . . :
>
> (1) The Limit of Insurance applicable to the lost or damaged property;

> (2) The cost to replace the lost or damaged property with other property:
>
> > (a) Of comparable material and quality; and
> >
> > (b) Used for the same purpose; or
>
> (3) The amount actually spent that is necessary to repair or replace the lost or damaged property. . . .

(Pls.' Mot., Ex. B, Policy at 16-17, §§ G.3.c, G.3.d, G.3.e (emphasis added).)

The parties do not dispute that the Limit of Insurance on Plaintiff Insured's policy is $364,000 and that its Coinsurance Percentage is 90%. (*Id*. at Declaration Page.)

**C. Parties' Arguments**

Plaintiff Insured argues that under the section of its policy providing for "Optional Coverages," the language "Replacement Cost (without deduction for depreciation)," when read along with other provisions of the policy as well as the payment limitations for that Optional Coverage (§ G.3.e(1) and (2)), means that Defendant Insurer must pay Plaintiff Insured the cost it will incur for replacing its old, damaged equipment with new equipment, as long as the cost does not exceed the policy limit of $364,000 and the new replacement equipment is of comparable material and quality and used for the same purpose (e.g., a Chevy for a Chevy, not a Cadillac or a jet for a Chevy). Defendant Insurer disagrees with this interpretation, arguing instead that this language only requires it to reimburse Plaintiff Insured for the cost of replacing its old, damaged equipment with used equipment of comparable material and quality.

**D. Interpretation of "Replacement Cost (without deduction for depreciation)"**

Considering the policy language as a whole, this Court agrees with Plaintiff Insured that "Replacement Cost (without deduction for depreciation)" means the cost for replacing new for old.  Absent a policy definition to the contrary, the term "depreciation," is given its plain, ordinary meaning -- a decrease in value because of wear or age.  To interpret this phrase, as Defendant Insurer urges -- to mean the cost for used, depreciated equipment of comparable material and quality  -- would require the Court to ignore the plain language of the "(without deduction for depreciation)" parenthetical in § G.3.a of the policy.  This is something the Court cannot do under Michigan contract law.

Defendant Insurer further argues that its interpretation of "Replacement Cost (without deduction for depreciation)" is supported by the absence of the word "new" in § G.3.e(2) and the absence of the phrase "with new property" in § G.3.e(3).  Section G.3.e provides that:

> e. We will not pay more for loss or damage <u>on a replacement cost basis</u> than the least of (1), (2) or (3) . . . :
>
> (1) The Limit of Insurance applicable to the lost or damaged property;
>
> (2) The cost to replace the lost or damaged property with other property:
>
>   (a) Of comparable material and quality; and
>
>   (b) Used for the same purpose; or
>
> (3) The amount actually spent that is necessary to repair or replace the lost or damaged property. . . .

(Pls.' Mot., Ex. B, Policy at 17, § G.3.e (emphasis added).)  Defendant Insurer's argument ignores the phrase "on a replacement cost basis" in the introductory sentence of this

subsection. The Court cannot do the same. Michigan law precludes the Court from ignoring the plain language included in this insurance contract.

Read as a whole, § G.3.e provides that the insurer is obligated to pay the least of G.3.e(1), (2), or (3), calculating the loss or damage on a replacement cost basis, which this Court interprets as "new-for-old basis." Section G.3.e thus limits the insurer's liability to the lesser of (1) the insured's policy limit, (2) the cost to replace old, damaged property with new property of comparable material and quality that is used for the same purpose (e.g., a Chevy for a Chevy, not a Cadillac for a Chevy, or a jet for a Chevy), or (3) the amount actually spent that is necessary to replace the damaged property (and not any excess amounts expended). Plaintiff Insured presents evidence that the Replacement Cost language in its policy is standard for this type of optional coverage in a commercial property policy and is well-understood in the insurance industry to mean that the insurer is obligated to indemnify the insured with new property, subject to various conditions. (Pls.' Reply, Ex. A, Gross Aff., ¶¶ 4-5; Pls.' Mot, Exs. D & E, insurance industry bulletin providing interpretation of "Replacement Cost" as meaning "new for old.")[4]

---

[4]As evidenced by these exhibits, The National Underwriters Company publishes legal interpretations of insurance policy language through its Fire, Casualty and Surety ("FC&S") Bulletins. One Bulletin specifically addresses the meaning of "Replacement Cost" insurance. An insurer wrote to FC&S requesting an interpretation of a replacement cost endorsement included in the insured's standard ISO insurance policy. (Pls.' Mot., Ex. E.) Lightning destroyed the insured's computerized phone system -- it could not be repaired and had to be replaced. The insurer located a used, reconditioned phone system of the same make and model as the destroyed phone system and offered to purchase and install it. The insurer believed that this would meet the insured's commercial insurance policy because it gave the insurance company the option to "pay the cost of repairing or replacing the lost or damaged property." The insured disagreed and felt it was entitled to a new phone system under its replacement cost endorsement. The National Underwriters Company agreed with the insured's interpretation:

To read Plaintiff Insured's policy as Defendant Insurer urges -- allowing it to indemnify Plaintiff Insured for the cost of replacing damaged property with used property of like kind and quality -- would nullify the Optional Replacement Cost Coverage entirely. Under Defendant's interpretation, Section G.3.e(2), which is part of the Replacement Cost Optional Coverage and indemnifies on a Replacement Cost basis, would mean the same thing as Sections E.4.a(2) and E.4.a(4), which are part of the main body of the insurance policy and indemnify on an Actual Cash Value basis (*see* § E.7.a). A comparison of the language of G.3.e(2) above with that of E.4.a(2) and (4) below illustrates this point.

> E. Loss Conditions
>
> The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.
>
> * * * * *
>
> 4. Loss Payment
>
> a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:
>
> (1) Pay the value of lost or damaged property;
>
> (2) Pay the cost of repairing or replacing the lost or damaged property, . . . ;
>
> (3) Take all or any part of the property at an agreed or appraised value; or

---

> The policy states that the value of the covered property (the phone system) will be determined "at replacement cost (without deduction for depreciation)." A reconditioned phone system is still a used phone system, and, as such, is depreciated. The policy promises the insured that losses to covered property will be adjusted on a replacement cost basis. Note that replacement cost means "new for old." The insured is entitled to a new phone system.

(Pls.' Mot., Ex. E (emphasis added).)

> (4) Repair, rebuild or replace the property with other property of like kind and quality, . . . .
>
> We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

(*Id*. at § E.4.a (emphasis added).)

Under its interpretation, Defendant Insurer is allowed to replace damaged property with used property of like kind and quality under § E.4.a(4) on an Actual Cash Value basis and is also allowed to the same thing under § G.3.e(2). Applying Michigan contract law, this Court rejects Defendant's interpretation of § G.3.e(2) because it nullifies the Optional "Replacement Cost" Coverage provided in that section, and ignores the "replacement cost basis" language provided in § G.3.e. Moreover, as expressly stated in § G.3.a, "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, [§ E.7.a] of this Coverage Form." (*Id*. at § G.3.a (emphasis added).)

Furthermore, Section E.7.a provides that the insurer "will determine the value of Covered Property in the event of loss or damage" to be calculated "[a]t actual cash value as of the time of loss or damage. . . ." (*Id*. at § E.7.a.) In contrast, under the Replacement Cost Optional Coverage, § G.3.c, the policy provides that the insured (rather than the insurer) is given the option of electing whether a claim will be valued on an actual cash value basis, replacement cost basis, or both:

> c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this

> Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

(*Id*. at § G.3.c (emphasis added).) The plain language of § G.3.c is inconsistent with Defendant Insurer's proffered interpretation of "Replacement Cost (without deduction for depreciation)." If that phrase means, as Defendant Insurer contends, that it need only reimburse the insured for the cost of replacing damaged equipment with used equipment that is of like kind and quality, then the language in § G.3.c allowing the insured to "still make a claim for the additional coverage" granted under the Replacement Cost Optional Coverage provision would be rendered irrelevant. Again, this is not allowed under well-established Michigan contract law.

As the undisputed facts show here, Plaintiff Insured did notify Defendant Insurer of its intent to make a claim for Replacement Cost Optional Coverage on August 14, 2012, within 180 days after the damage to its Router and Panel Saw.[5] Even if, as Defendant Insurer argues, Plaintiff Insured made a claim on an Actual Cash Value basis for the used Panel Saw it purchased and the Router it rented, § G.3.c allows Plaintiff Insured to also make a claim for the "additional coverage" provided under the Replacement Cost provisions of the insurance policy -- reimbursement for the cost of replacing damaged equipment with new equipment of comparable material and quality that is used for the same purpose as the old, damaged equipment.

[5]These undisputed facts refute Defendant Insurer's waiver argument. (Resp. at 15-16.)

## IV. Conclusion

For the above-stated reasons, Plaintiffs' motion for partial summary judgment is GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: December 23, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 23, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol Hemeyer